NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| PETER MONFORTE, et al. | Civil Action No. 11-5085 (JLL) (JAD) |
|---|---|
| Plaintiffs, | |
| v. | OPINION |
| WATERFRONT COMMISSION OF NEW YORK HARBOR, et al. | |
| Defendants. | |

**LINARES, District Judge.**

This matter comes before the Court by way of Defendants Waterfront Commission of New York Harbor (the "Commission") and Jason Szober (collectively "Defendants")' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to the instant motion and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court GRANTS Defendants' motion.

**I.  BACKGROUND**

In 1953, the Commission was created by way of the Waterfront Commission Compact, an interstate agreement between New York and New Jersey that was approved by Congress. Waterfront Comm'n Compact Between the States of N.Y. & N.J., Pub. L. No. 252-407, 67 Stat. 541 (1953). The Commission operates pursuant to the Waterfront Commission Act (the "Act"), which incorporates the terms of the Compact. N.J.S.A. § 32:23-1, *et seq.*; McK. Unconsol. Laws § 9801, *et seq.* The Commission's ongoing mission is to investigate and combat crime and corruption in the Port of New York (the "Port"). N.J.S.A. §§ 32:23-2 to -5, 32:23-10; McK.

1

Unconsol. Laws §§ 9802– 9805, 9810. The Commission has two powers that are relevant to this action.

First, the Commission decides who may work in the Port as a longshoreman. N.J.S.A. §§ 32:23-27 to -33; McK. Unconsol. Laws §§ 9827–9833. A person who wishes to work as a longshoreman within the Port must first apply for inclusion in the longshoremen's register. N.J.S.A. § 32:23-29; McK. Unconsol. Laws § 9829. The Commission may deny a person's application if his presence in the Port is found by the Commission to constitute a "danger to the public peace or safety." N.J.S.A. § 32:23-29(c); McK. Unconsol. Laws § 9829(c). The Commission may also remove a person's name from the longshoremen's register for a number of other reasons. *See* N.J.S.A. § 32:23-31; McK. Unconsol. Laws § 9831.

Second, the Commission decides what companies may operate as stevedores in the Port. N.J.S.A. §§ 32:23-19 to -24; McK. Uconsol. Laws. §§ 9819–9824. A company that wishes to operate as a stevedore within the Port must first apply to the Commission for a stevedore license. N.J.S.A. § 32:23-19; McK. Uconsol. Laws. § 9819. In order to grant a license, the Commission must be satisfied that the applicant company possesses "good character and integrity." N.J.S.A. § 32:23-21(b); McK. Unconsol. Laws § 9821(b). Pending final action on the company's application for a stevedore license, the Commission may issue the company a temporary permit. N.J.S.A. § 32:23-22; McK. Unconsol. Laws § 9822. Once granted, the Commission may revoke or suspend a company's stevedore license as it "deems in the public interest." N.J.S.A. § 32:23-24; McK. Unconsol. Laws § 9824.

In March 2008, the Commission temporarily suspended Plaintiff Peter Monforte's registration to work on the waterfront because he was indicted for two drug crimes. (Pls.' 56.1 Stmt. ¶¶ 14, 17, ECF No. 38-1; Defs.' 56.1 Stmt. ¶¶ 14, 17, ECF No. 40-1). Monforte eventually

pled guilty to these crimes in September 2008, and was sentenced to three months in prison followed by a two-year term of supervised release. (Pls.' 56.1 Stmt. ¶¶ 15-16; Defs.' 56.1 Stmt. ¶¶ 15-16). Monforte was released from prison in May 2009, and began working for Apexel, a stevedore company located in Port Newark, that month. (Pls.' 56.1 Stmt. ¶¶ 18-19; Defs.' 56.1 Stmt. ¶¶ 18-19). Shortly thereafter, the Commission learned of Monforte's employment with Apexel. (Pls.' 56.1 Stmt. ¶¶ 22-24; Defs.' 56.1 Stmt. ¶¶ 22-24)

By letter dated June 26, 2009, Defendant Jason Szober, an assistant counsel at the Commission, informed Apexel that the Commission would deny Apexel's application for a permanent stevedore license and revoke, cancel, or suspend Apexel's temporary stevedore permit if Apexel continued to employ Monforte. (Pls.' 56.1 Stmt. ¶¶ 8, 24; Defs.' 56.1 Stmt. ¶¶ 8, 24). Szober explained that the Commission had temporarily suspended Monforte's registration, and that it considered Apexel's continued employment of Monforte as a reflection that Apexel lacked the requisite "good character and integrity" to possess a stevedore license. (Pls.' 56.1 Stmt. ¶ 24; Defs.' 56.1 Stmt. ¶ 24). Apexel subsequently terminated Monforte, and he worked his last day in August 2009. (Pls.' 56.1 Stmt. ¶ 26; Defs.' 56.1 Stmt. ¶ 26).

On July 22, 2011, Plaintiffs Monforte and the union that represents him, the International Longshoreman's Association Local 1804-1 (the "Union"), filed a Complaint in the Superior Court of New Jersey, Essex County. (Compl., ECF No. 1). Defendants subsequently removed Plaintiffs' action to this Court on September 1, 2011. (*Id.*). Plaintiffs allege that Defendants: (1) violated Monforte's civil rights; (2) singled out Monforte for exclusion from employment because of his Italian origin and ancestry, and, thereby, violated the New Jersey Law Against Discrimination ("NJLAD"); (3) tortiously interfered with Monforte's economic advantage; and (4) tortiously interfered with the Union's Collective Bargaining Agreement ("CBA") with

3

Apexel. (*Id.*). This Court has federal question jurisdiction over Plaintiffs' "civil rights" claim pursuant to 28 U.S.C. § 1331. *See Marina Bay Towers Urban Renewal II, L.P. v. City of N. Wildwood*, No. 09-369, 2009 WL 2147356, *3 n. 7 (D.N.J. July 14, 2009) (finding existence of federal question jurisdiction where complaint asserted claim for "civil rights" without reference to constitutional or statutory provision); *cf. Lazorko v. Pennsylvania Hosp.*, 237 F.3d 242, 248 (3d Cir. 2000) ("If a federal question appears on the face of the plaintiff's complaint, the defendant may remove the case to federal court."). This Court has supplemental jurisdiction over Plaintiffs' NJLAD and tortious interference claims pursuant to 28 U.S.C. § 1367. Defendants now move for summary judgment. (Defs.' Mot. for Summ. J., ECF No. 38).

## II.  LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III. DISCUSSION

Defendants now move for summary judgment as to all of Plaintiffs' claims. With regard to Plaintiffs' civil rights and NJLAD claims, Defendants argue that they are entitled to summary judgment because Plaintiffs have failed to provide any supporting evidence. With regard to Plaintiffs' tortious interference claims, Defendants argue that Plaintiffs cannot prove an essential element of these claims, namely, malice. The Court now explains why Defendants' arguments are persuasive and, thus, why they are entitled to summary judgment as to each of Plaintiffs' claims.

### A. Plaintiffs' Civil Rights Claim

Without reference to any specific statute, rule, or case law, Count Four of Plaintiffs' Complaint vaguely alleges that the Commission violated Monforte's "civil rights." Defendants argue that they are entitled to summary judgment because Plaintiffs have failed to produce any evidence in support of this allegation that creates a genuine dispute of material fact. (Def. Br. 19-21, ECF No. 38-2). Plaintiffs' Opposition Brief does not refute this argument and does not point to any genuine disputes of material fact related to Plaintiffs' "civil rights" claim. (*See* Pls.' Opp'n Br., ECF No. 40).

To recover under 42 U.S.C. § 1983 for a deprivation of their civil rights, Plaintiffs "must establish that the defendant[s] acted under color of state law to deprive [them] of a right secured by the Constitution." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). Here, Plaintiffs have not even explained which particular civil rights they were deprived of by Defendants. To the extent that Plaintiffs allege that Defendants deprived them of due process, Plaintiffs admit that the Commission provided Monforte with a hearing before revoking his registration to work on the waterfront. (Pls.' 56.1 Stmt. ¶¶ 31-33; Defs.' 56.1 Stmt. ¶¶ 31-33).

5

Plaintiffs also admit that Monforte admitted to all of the counts that the Commission alleged against him at said hearing. (Pls.' 56.1 Stmt. ¶ 32; Defs.' 56.1 Stmt. ¶ 32). Because there are no genuine disputes of material fact with regard to Plaintiffs' "civil rights" claim, and because Plaintiffs do not point to any evidence in support of this claim, Defendants are entitled to summary judgment in their favor.

B.  Plaintiffs' NJLAD Claim

Count Five of Plaintiffs' Complaint alleges that Defendants violated the NJLAD by singling out Monforte for exclusion from employment because of his Italian origin and ancestry. Monforte admits that he cannot point to any facts to support this allegation. (Pls.' 56.1 Stmt. ¶ 39; Defs.' 56.1 Stmt. ¶ 39). Moreover, Plaintiffs have set forth no arguments in support of their NJLAD claim in their Opposition Brief. Since there are no genuine disputes of material fact, Defendants are entitled to summary judgment with regard to Plaintiffs' NJLAD claim.

C.  Plaintiffs' Tortious Interference Claims

Counts One and Three of Plaintiffs' Complaint allege that Defendants tortiously interfered with Monforte's economic advantage and the Union's CBA with Apexel, respectively. To establish a claim for tortious interference, Plaintiffs must prove four elements. *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739 (1989). First, Plaintiffs must prove actual interference with a protectable right such as "a prospective economic or contractual relationship." *Id.* (citation and internal quotations omitted); *Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003) (citation omitted). Second, Plaintiffs must prove "that the interference was done intentionally and with malice . . . ." *MacDougall*, 144 N.J. at 404 (citation and internal quotations omitted). Third, Plaintiffs must prove that absent interference, "there was a reasonable probability that the victim of the

6

interference would have received the anticipated economic benefits." *Id.* (citation and internal quotations omitted). Fourth, Plaintiffs must prove "that the injury caused damage." *Id.* (citation and internal quotations omitted).

Here, Defendants contend that Plaintiffs cannot prove the element of malice. (Def. Br. 7-11). A defendant acts with malice when he intentionally inflicts harm "without justification or excuse." *MacDougall*, 144 N.J. at 404 (citation and internal quotations omitted). The inflicted harm that is the basis of both of Plaintiffs' tortious interference claims is the letter that the Commission sent to Apexel. Again, the letter, which eventually caused Apexel to terminate Monforte, stated that the Commission considered Apexel's continued employment of Monforte as a reflection that Apexel lacked the requisite "good character and integrity" to possess a stevedore license. (Pls.' 56.1 Stmt. ¶¶ 24, 26; Defs.' 56.1 Stmt. ¶¶ 24, 26).

Defendants argue that the Commission's power to grant stevedore licenses to companies, like Apexel, was a proper "justification" for sending the letter. (Def. Reply Br. 2-5, ECF No. 45). Therefore, according to Defendants, Plaintiffs cannot show malice—an essential element of a tortious interference claim. (*Id.*). In response, Plaintiffs cite to testimony stating that Monforte worked at an Apexel facility that was outside of the Commission's jurisdiction. (Pls.' Opp'n Br. 8-9; Pls.' Ex. A 43:18 – 44:17, ECF No. 41; Pls.' Ex. C-2 32:14-19, ECF No. 44). Absent such jurisdiction, Plaintiffs argue that Defendants lacked a justification for sending the letter, and, thus, acted with malice. (Pls.' Opp'n Br. 8-9).

Regardless of whether Monforte worked at an Apexel facility that was outside of the Commission's jurisdiction, there is no genuine dispute of material fact that the Commission possessed licensing authority over Apexel. (*See* Pls.' 56.1 Stmt. ¶ 24; Defs.' 56.1 Stmt. ¶ 24). Indeed, during an arbitration proceeding that preceded this matter, Apexel's former president,

7

Joseph Curto, testified that Apexel needed a stevedore license from the Commission to conduct business. (Maderer Decl. Ex. M 3-4, ECF No. 39; Pls.' Ex. C-1 15:8-18, ECF No. 43). Likewise, Plaintiffs cited to testimony from the Union's secretary treasurer, Michael Vigneron, noting that Apexel had "on terminal spots," *i.e.*, facilities within the Commission's jurisdiction. (Pls.' Ex. A 43:24 – 44:4).

Here, given the Commission's undisputed licensing authority over Apexel and Monforte's undisputed convictions for two drug crimes, the Commission was justified in sending the letter to Apexel. The Commission could grant a stevedore license to Apexel only if it was satisfied that Apexel possessed "good character and integrity." N.J.S.A. § 32:23-21(b); McK. Unconsol. Laws § 9821(b). Apexel's employment of Monforte, who had recently pled guilty to two drug crimes, reasonably caused the Commission to doubt that Apexel possessed these qualities. (Defs.' 56.1 Stmt. ¶¶ 15, 24; Pls.' 56.1 Stmt. ¶¶ 15, 24). Therefore, the Commission properly exercised its "broad powers of licensing and regulation to carry out the purposes of the Act." *See Knoble v. Waterfront Comm'n of N.Y. Harbor*, 67 N.J. 427, 430-32 (1975) ("We must recognize the Commission's long standing experience with waterfront problems and ordinarily defer to its judgment as to the appropriate penalty or discipline to be imposed in a given situation.") (citations omitted); *CC Lumber Co., Inc. v. Waterfront Comm'n of N.Y. Harbor*, 31 N.Y. 2d 350, 358 (1972) ("It would be difficult or impossible for the Legislature to lay down a definitive, comprehensive rule by which the commission could measure an applicant's character and integrity. Of necessity such determinations are addressed to the sound discretion of the commission."); *see also New York Shipping Ass'n, Inc. v. Waterfront Comm'n of N.Y. Habor*, 460 F. App'x 187, 188 (3d Cir. 2012) ("The Commission may, in its discretion, deny

applications for and revoke stevedoring licenses as it deems in the public interest.") (citation omitted).

Because the Commission did not inflict harm against Monforte without justification or excuse, Plaintiffs cannot show malice—an essential element of their tortious interference claims. *See Printing Mart-Morristown*, 116 N.J. at 757 (1989) (noting that an interference is malicious only when it is not "sanctioned by the rules of the game.") (citation and internal quotations omitted). Accordingly, Defendants are entitled to summary judgment in their favor as to Plaintiffs' tortious interference claims.

## IV. CONCLUSION

For the reasons discussed herein, the Court GRANTS Defendants' motion for summary judgment.

An appropriate Order accompanies this Opinion.

DATED: 6 of February, 2014.

JOSE L. LINARES
U.S. DISTRICT JUDGE